# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Warren K. Urbom | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8011 | **DATE** | 2/14/2002 |
| **CASE TITLE** | Miller vs. Cook County Public Defenders' | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum and Order: Defendant's motion for summary judgment (51-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | FEB 20 2002 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | docketing deputy initials | 163 |
| | Mail AO 450 form. | 2/14/2002 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| GL courtroom deputy's initials | | GL mailing deputy initials | |

U.S. DISTRICT COURT CLERK
02 FEB 19 PM 3:37

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LYNNE H. MILLER,                          )      Case No. 99 C 8011
                                          )
              Plaintiff,                  )
                                          )
vs.                                       )      MEMORANDUM AND ORDER
                                          )      ON DEFENDANT'S MOTION FOR
                                          )      SUMMARY JUDGMENT
COOK COUNTY PUBLIC DEFENDERS'             )
OFFICE,                                   )
                                          )
              Defendant.                  )

DOCKETED
FEB 2 0 2002

The defendant has submitted its Statement of Uncontested Facts in Support of Defendant Cook County Public Defenders' Office's Motion for Summary Judgment. ("D's Facts") The plaintiff has filed the Plaintiff's Response to Defendant's Statement of Facts, and Statement of Additional Facts ("P's Response to D's Facts"), to which the defendant has filed Defendant's Reply Memorandum; Defendant's Reply to Plaintiff's Additional Facts & Defendant's Reply to Plaintiff's Responses to Defendant's Statement of Facts ("D's Reply").

To set the stage for determining whether the defendant has carried its burden of showing under Rule 56 of the Fed. R. Civ. P. that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" (Rule 56(c)) and, if so, whether the plaintiff, as the adverse party, has "set forth specific facts showing that there is a genuine issue for trial." (Rule 56(e)) I must decide what evidence offered by the parties can be received in evidence. For that I shall deal first with D's Facts, taking each paragraph that has not been assented to by the plaintiff.

## I. Defendant's Statement of Uncontested Facts in Support of Defendant Cook County Public Defenders' Office's Motion for Summary Judgment (D's Facts)

Paragraph 4. The plaintiff contests the information contained in paragraph 4 to the extent that "she has lived at the indicated address since August 2001 as opposed to February of 2000," (P's Response to D's Facts), but she offers no citation to the record to support the August 2001 date. The February 2000 date is supported by the defendant's cited material, namely, Defendant's Ex. 4, the Plaintiff's Deposition, at 8:6-24. Hence, the defendant's paragraph 4 stands in accordance with LR56.1(b)(3)(A) and (B).

Paragraph 6. The plaintiff's assertion is that "at the time of her placement in the position of Chief of the Training Division, Plaintiff was the Chief of the Juvenile Division, and not an Attorney Supervisor." (P's Response to D's Facts, ¶ 6). The plaintiff's response does not cite

any support in the record of her position, so the defendant's paragraph 6 stands in accordance with LR56.1(b)(3)(A) and (B).

Paragraph 8.    The plaintiff contests the information in this paragraph to the extent that "she reported directly to Rita Fry only extraordinary problems, as she was directed to do by Rita Fry." (P's Response to D's Facts, ¶ 8).   The plaintiff has not cited any reference to the record for her position and the defendant's citation, Defendant's Ex. 9, supports the defendant's paragraph 8, so the defendant's paragraph 8 shall stand.

Paragraph 9.   The plaintiff contests paragraph 9 (P's Response to D's Facts, ¶ 9), but offers no citation to the record.   Defendant's Ex. 10, cited by the defendant, does not support the statement in paragraph 9.   Accordingly, paragraph 9 shall not be considered as evidence.

Paragraph 11.   The plaintiff contests the information contained in paragraph 11 (P's Response to D's Facts, ¶ 11), but gives no citation to the record.   The statement in the defendant's paragraph 11 is supported by the affidavit of Lauren Simon, Defendant's Ex. 9.   The defendant's paragraph 11 shall stand.

Paragraph 13.   The plaintiff contests the assertion that she circumvented the change of command to obtain time off, but does not give any reference to the record.   The contested matter is supported by the Defendant's Ex. 9, the Simon affidavit, ¶ 4.   Paragraph 13 shall stand.

Paragraph 45.   The plaintiff contests only to the extent that "the memorandum referenced therein expressly states that the basis for Lauren Simon's denial of Plaintiff's request is 'operational necessity'."   It appears to me that defendant's paragraph 45 does not say that the basis for the denial of the plaintiff's request was "operational necessity," but the memorandum referenced, Defendant's Ex. 43, does say that the basis for the denial is "operational necessity." I think that the plaintiff is contesting the truth of what the memorandum states, not what paragraph 45 states. It is paragraph 45, not the memorandum itself, that will be considered as evidence.

Paragraph 46.   The information in paragraph 46 is contested by the plaintiff, but she offers no reference to the record to contradict any part of paragraph 46.   The exhibit cited by the defendant in support of paragraph 46 is erroneously listed as "Ex. 44, Simon Memo of 7/22/97." The Simon Memo of 7/22/97 is Defendant's Ex. 43 and it supports all that is said in paragraph 46.   The plaintiff has not objected to use of the document, Defendant's Ex. 43.   The information in paragraph 46 shall stand as evidence.

Paragraph 47.   The plaintiff "contests the information contained in Defendant's paragraph 47, to the extent that Plaintiff did not, in the memorandum referenced therein, contest the requirement that she document the need for weekly time off. Instead, she merely requested clarification regarding the types of documentation that was necessary." (P's Response to D's Facts, ¶ 47).   I agree with the plaintiff as to the sense of Defendant's Ex. 44, P's Memo of

7/23/97.

Paragraph 47 will not be considered evidence.

Paragraph 52. Although the plaintiff says she contests the information in this paragraph, she actually is only adding on information contained within paragraph 44 through 47 of the Plaintiff's Statement of Additional Facts, filed January 4, 2002. (P's Stmt of Add'l Facts). The defendant does not contest the information contained in paragraphs 44 through 47 of P's Stmt of Add'l Facts. Paragraph 52 of the D's Facts will be considered as evidence.

Paragraph 65. The plaintiff contests this information in that "it was not until she returned to work that she learned that she had been placed in a position other than Chief of the Training Division." (P's Response to D's Facts, ¶ 65). That response does not contradict the contents of paragraph 65 and, insofar as it seeks to add additional information, it contains no reference to the record. Paragraph 65 will be considered evidence.

Paragraph 67. The plaintiff contests the information in paragraph 67 as to the official job title. That response contains no reference to the file for its support, so paragraph 67 will be received as evidence.

## II. Plaintiff's Statement of Additional Facts
## (P's Stmt of Add'l Facts)[1]

The defendant has contested some of the paragraphs of the plaintiff's Statement of Additional Facts (P's Stmt of Add'l Facts). The following is my ruling on the objections to and motions to strike those paragraphs. Whenever I indicate the sustaining of an objection, I also intend the granting of the motion to strike.

Paragraph 2. The defendant objects to paragraph 2 in its entirely and moves to strike it "because it is based on hearsay and therefore does not adequately support the asserted fact with admissible evidence. *Rosemary B. v. Board of Education of Community High Sch. Dist. No. 155,* 52 F.3d 156 (7th Cir. 1985)."

---

[1] I note that on February 11, 2002, I received the Defendant's Objection to Plaintiff's Reply to Defendant's Response to Plaintiff's Statement of Facts. I have examined that document, but shall not grant the objection. I have already resolved all of the issues pertaining to the P's Stmt of Add'l Facts before receiving that objection and I do not see that the Plaintiff's Reply to Defendant's Response to Plaintiff's Statement of Facts has had any detrimental effect to the defendant's case. For me to go through the rulings and discussions I have made about the P's Stmt of Add'l Facts would be an unnecessary task, best avoided by my denying the defendant's objection received February 11.

There is no doubt that paragraph 2 is based on hearsay. Ex. 2, which is the support in the record cited by the plaintiff, is an undated letter from the plaintiff to Public Defender Rita Fry. The plaintiff, however, submits that the objection is unfounded "in that LR56.1 does not by its express terms preclude hearsay nor does the case (*Rosemary B.*) cited by Defendant . . . stand for the proposition that LR56.1 precludes hearsay. Instead, all that LR56.1(b)(3) requires is a 'specific reference' to 'affidavits, parts of the record, and other supporting materials relied upon.' Paragraph 2 satisfies this requirement." (P's Reply to D's Response to P's Facts, ¶ 2).

The difficulty with the plaintiff's argument is that LR56.1 neither purports to change the Federal Rules of Evidence or Rule 56 of the Federal Rules of Civil Procedure, nor could it change them. Rule 56 is designed only to set out a procedural design for presenting evidence regarding motions for summary judgment. It does not suggest that it enlarges or constrains or otherwise alters Rule 56 of the Fed. R. Civ. P. Rule 56 clearly requires that the Rules of Evidence be followed. Rule 56(c) says:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Emphasis added.)

The kind of evidence to be used is further announced in Rule 56(e), wherein it says:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial . . . (Emphasis added).

This is not to say, of course, that proposed statements of fact cannot be supported by affidavits not made on personal knowledge, or facts that would not be admissible in evidence, or documents that are not certified copies if they are offered and not opposed, thus amounting to an offer of evidence to which no objection is made. It is as if during a trial an offer of evidence is made and if no objection is made to it, the evidence will be received even though it would not be received if a suitable objection had been made. But where an objection is made or a contest declared and supported, the Rules of Evidence must apply. This in keeping with this district's local rules.

LR56.1 says that all material facts set out in either party's statement filed pursuant to LR56.1 "will be deemed admitted unless controverted by the statement" of the adverse party. *See* 56.1(a)(3)(B) and 56.1(b)(3)(B).

As to paragraph 2 of the P's Stmt of Add'l Facts, the document upon which the plaintiff relies for the factual statement is an undated letter from the plaintiff herself to Public Defender Rita Fry, and therefore is hearsay under Rules 801(a) and 802 and meets none of the exceptions or exemptions of Rules 801(d), 803 or 804. The objection to paragraph 2 is sustained and the contents of paragraph 2 will not be considered as evidence.

Paragraph 4. The defendant objects to the paragraph in its entirety and moves to strike it, because it is based on hearsay. The plaintiff's reply is the same as its reply respecting paragraph 2.

The document cited by the plaintiff for support of the information in paragraph 4 is Plaintiff's Ex. 5, titled "Decision of Arbitrator," before the Industrial Commission of Illinois, dated February 11, 1998. No objection has been made as to its authenticity and under Rule 803(8) factual findings from such proceedings may be received in evidence in civil actions "unless the sources of information or other circumstances indicate lack of trustworthiness." I find no indication that there is a lack of trustworthiness in the evidence before me, so I conclude that, although the contents of paragraph 4 are founded upon hearsay, the exception contained in Rule 803(8) allows the evidence to be received. The objection and the motion to strike are denied.

Paragraph 5. The defendant objects in its entirety and moves to strike because the information contained in the affidavit cited by the plaintiff for support is P's Ex. 6, the affidavit of Jason Gylling, who is the plaintiff's counsel and, therefore, is not derived from the affiant's personal knowledge. The plaintiff argues that the affidavit is appropriate, because it "indeed is based upon affiant's personal knowledge–i.e., the knowledge of what Plaintiff represented to him." She says (by argument, not by an affidavit of hers) that she was wheelchair-bound and "would have had a tremendously difficult time getting to a notary's office and what was said to her by the affiant and what is related in the affidavit was within the plaintiff's personal knowledge." I reject the plaintiff's argument.

It is true that the affiant had some personal knowledge: he knew that the plaintiff had told him certain things; but he has not shown that he knew what she told him was true from his personal knowledge. The statement in paragraph 5 is offered to show, not that she said things to her counsel, but that what she said was true. Accordingly, the statement in paragraph 5 is not based upon the personal knowledge of the affiant and therefore runs afoul of Fed. R. Civ. P. 56(e) and Fed. R. Evid. Rule 602.

Assuming that the plaintiff was wheelchair-bound (there is no admissible evidence in the record that she was) makes no difference. If the plaintiff is concerned about the practicality of a

rule that would prevent her from presenting her own affidavit because, as she says, she would have had "a tremendously difficult time getting to a notary's office," I suggest that perhaps she could have had a notary come to her or she could have utilized the expedient of 28 U.S.C. § 1746, which declares that a writing subscribed "as true under penalty of perjury, and dated" has the same force and effect as an affidavit, if made in substantially the following form:

> I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

and signed.

The objection to paragraph 8 is sustained.

Paragraph 9. The defendant objects in its entirety to the statement that the plaintiff was able to complete successfully the bulk of her duties for several weeks as being an opinion and a conclusion. That objection is overruled. The statement is within the perimeters of Rule 701 of the Fed. R. of Evid. The defendant also objects to the statement that the plaintiff's staff were directed by the defendant not to communicate with the plaintiff, as being based on hearsay. That objection is sustained. All of the statement in paragraph 9 is considered to be in evidence, except that which states "until her staff were directed by Defendant not to communicate with her."

Paragraph 17. The defendant objects and moves to strike, because paragraph 17 is based on hearsay. The objection is sustained. The cited support for paragraph 17 is P's Ex. 11, a letter from the plaintiff to other persons.

Paragraph 19. The defendant objects on hearsay grounds, and the objection is sustained. The supporting document cited is Ex. 11, a letter from the plaintiff to other persons.

Paragraph 22. The defendant objects and moves to strike, because paragraph 22 is based on hearsay. That objection is sustained. The document referred to as support for paragraph 22 is P's Ex. 11, a letter from the plaintiff to others.

Paragraph 26. The defendant objects and moves to strike the paragraph, because it is based on P's Ex. 6, which is the affidavit of Jason Gylling and not derived from the personal knowledge of the affiant. That objection is sustained as previously explained. The defendant also objects because "the affidavit is contradicted by Plaintiff's deposition testimony." That objection is overruled, because the affidavit is not contradicted by those portions of the plaintiff's deposition cited by the defendant.

Paragraph 28. The defendant objects because the information in the single document cited by the plaintiff for support is the affidavit of Jason Gylling which contains no information derived from personal knowledge of the affiant. For the reasons already explained elsewhere,

that objection is sustained.

Paragraph 29.  The defendant objects on the ground of hearsay and the objection is sustained.  The part of the record relied upon by the plaintiff is P's Ex. 14, a memorandum from the plaintiff to Public Defender Rita Fry, dated 8/27/97.

Paragraph 31.  The defendant objects because paragraph 31 is derived from P's Ex. 6, the affidavit of Jason Gylling, which cannot be used for reasons earlier expressed.  The objection is sustained.

Paragraph 36.  The defendant objects and moves to strike the portion "that states the conclusion that nothing critical took place in the training division on July 23, 1997, or July 30, 1997."  The objection is overruled.  The statement is within Rule 701 of the Fed. R. Evid.

Paragraph 53.  The defendant does not contest that the plaintiff was placed into the Appeals Division as a supervisor in May 1998.  That portion will be considered as evidence.

The defendant "contests that plaintiff found out about her position change upon returning to work because she had been notified on 4/11/98 that the Chief of Training position was being filled by another employee," citing Df. SOF, ¶ 65.  The source of the information in the record relied upon by the plaintiff is the P's Ex. 51, a memorandum from Jim Reddy, dated 5/4/98.  That exhibit does not support factually that the plaintiff returned to work the beginning of May 1998, or when she discovered the change of her position.  On the other hand, the document cited by the defendant as to when the plaintiff found out about her position change upon returning to work in D's Facts, at ¶ 65 is similarly deficient.  D's SOF 65 relies upon D's Ex. 61 (D's SOF 65 cites "Ex. 60 incorrectly.  It describes the exhibit as "Burnette Letter of 4/17/98, which is D's Ex. 61).  D's Ex. 61 does not say when the plaintiff received notice of the memorandum and does not say when she returned to work.  Accordingly, paragraph 53 is received only for the fact that the plaintiff was placed in the Appeals Division as a supervisor in May 1998.

Paragraph 58.  The defendant contests that the plaintiff did not receive a response to her September 16, 1998, letter in that Rita Fry sent a memorandum to the plaintiff regarding the plaintiff's use of "zero" day and suggesting that leave of absence might be appropriate for her medical situation.  The defendant cites Def. SOF 70, which refers to D's Ex. 67, a memo of 10/7/98, which may be construed as being a response to the plaintiff's 9/16/98 letter.  The plaintiff cites P's Ex. 7, which is the plaintiff's answers to the defendant's interrogatory No. 1.  P's Ex. 7 is not objected to and on page 6 of P's Ex. 7 there is at least oblique support for paragraph 58.  Therefore, paragraph 58 is contested and yet supported, so a question of fact is the result.

## III. Facts That Remain in Evidence

The foregoing rulings leave in evidence from the parties statements of facts the following:

Plaintiff was employed by defendant, the Cook County Public Defender ("PD's Office"), commencing May 16, 1989. (Ex. 1, Offer of Employment Letter.) (D's Facts, ¶ 1)

At the time of her employment, and continuing through April 22, 1998, plaintiff reported her residence address as 5814 Lake Edge, McFarland, Wisconsin. (Ex. 1, *supra*; Ex. 2, Return From WC 7/22/97.) (D's Facts, ¶ 2).

On April 22, 1998, Plaintiff reported a change of address to 417 Homestead Road, LaGrange Park, Illinois. (Ex. 3, Payroll Status change of 4/22/98.) (D's Facts, ¶3).

Plaintiff currently resides at 7434 W. Valley Ridge, Madison, Wisconsin, approximately 140 miles from Chicago; and she has resided at that address since approximately February, 2000. ( Ex. 4, Miler (sic) dep. at p. 8, lines 6-24 and p. 24, lines 18-21.) (D's Facts, ¶ 4).

Plaintiff received promotions in responsibility and salary as she continued her employment with the PD's Office, including; promotion to a Grade 3 salary level on November 6, 1992; promotion to Attorney Supervisor in December, 1993; and promotion to Chief of the Juvenile division on February 1, 1995. (Group Ex. 5 a-d, Documents re: Grade 3 Promotion; Ex. 6, Promotion - Atty. Spvr.; Ex. 7, Promotion - Chief Juv.) (D's Facts, ¶ 5.)

Throughout, and after, the period during which Plaintiff received the promotions detailed in paragraph 5 of Defendant's statement of facts, Plaintiff consistently received commendations for the quality of her work. (Group Ex. 1 a-f; 9/2701 memo, 10/10/91 letter, 1992 performance evaluation, 4/19/93 memo, 6/29/93 letter, 6/29/96 letter) (P's Stmt of Add'l Facts, ¶ 1).

In her capacity Attorney Supervisor, plaintiff was placed in various assignments, and on January 23, 1996, plaintiff was advised that she was being placed in the position of Chief of the Training Division. (Ex. 8, Fry Letter of 1/23/96.) (D's Facts, ¶ 6).

In the position of Chief of Training, plaintiff's supervisory chain of command consisted of Lauren Simon ("Simon"), Director of Countywide Operations for the PD's Office, Ed Burnette ("Burnette"), First Assistant Public Defender, and Rita Fry ("PD Fry"), Public Defender of Cook County. (Ex 4, Miller dep. at p. 145, lines 6-12; Ex. 9, Simon Aff ¶ 1.) (D's Facts, ¶ 7).

During her first eight months in the position of Chief of Training, plaintiff developed a habit of reporting problems directly to PD Fray, which resulted in Simon being instructed by Fry to enforce the chain of command, and require plaintiff to report to her. (Ex. 9, Simon aff. ¶ 2.) (D's Facts, ¶ 8).

On November 17, 1996, a fractured portion of one of two herniated discs in Plaintiff's lower back shifted in such a way as to crush the sciatic nerve in her left leg. (Ex. 2, undated letter from Plaintiff to Public Defender Rita Fry). (P's Stmt of Add'l Facts, ¶ 2.

On December 11, 1996, Simon advised plaintiff that she must provide prior notification of time off requests. (Ex. 10, *supra*; Ex. 11, Agenda for meeting 12/11/96.) (D's Facts, ¶ 10.)

Plaintiff stated that she would be unable to meet the requirement that she give advance notification of time off requests, became angry, and called Simon a "petty bureaucrat." (Ex. 10, Simon memo of 8/19/97; Ex. 9, Simon aff. ¶ 3.) (D's Facts, ¶ 11).

On December 18, 1996, plaintiff authored a weekly report wherein she stated; "I will be taking days off as, in my opinion, 'operational necessity' permits." (Ex. 12, Weekly Report of 12/9/96.) (D's Facts, ¶ 12).

In a weekly report dated December 18, 1996, Plaintiff notified Lauren Simon that she would be taking days off as "operational necessity" permitted. The reason for Plaintiff's reference to "operational necessity" was that she intended to schedule her time off around the meeting dates and deadlines then in effect in the Training Division. (Ex. 3, weekly report dated 12/18/96). Additionally, it was Plaintiff's practice to scheduled (sic) her time off around the time of (sic) taken by the two other employees in the Training Division. (Ex. 4, memo from Plaintiff to Lauren Simon, dated 1/29/97; par. I, sub-par. C). (P's Stmt of Add'l Facts, ¶ 3).

On December 23, 1996, Simon responded to plaintiff's report by authoring a memo reiterating office policy relating to requests for time off, but subsequently learned that plaintiff had circumvented the chain of command to obtain time off for December 23, 1996-January 10, 1997. (Ex. 13, Simon memo of 12/23/96; Ex. 14, Tello memo of 12/18/96; Ex. 9, Simon Aff. ¶ 4). (D's Facts, ¶13).

On December 31, 1996, plaintiff called the office of PD Fry and left a voice mail message indicating for the first time that she had been treated for a back injury sustained sometime around Thanksgiving, and would be unable to return to work until "sometime around the first of the year. (Ex. 15, Fannie memo 12/31/96.) (D's Facts, ¶ 14).

Plaintiff did not return to work the week of 1/13/97-1/17/97. (Group Ex. 16 p-t, Daily Time Sheets: 12/23/96- 1/31/97.) No written request for sick leave or an extension of vacation time was submitted by plaintiff in support of her extended absence. (Ex. 9, Simon aff. ¶ 5.) (D's Facts, ¶15).

On January 20, 1997, plaintiff again called the office of PD Fry to report that she would not be returning to work at that time. (Ex. 9, Simon aff. ¶ 6.) (D's Facts, ¶ 16).

Although that call was not directed to Simon, as mandated by chain of command, when

Simon learned of it she called plaintiff and advised her to make a proper request for sick leave if she intended to remain absent from work. (Ex. 9, Simon aff. ¶ 7.) Simon advised plaintiff that no further requests for extension of vacation or other accrued time would be approved without an appropriate request. (*Id.*) (D's Facts, ¶ 17).

The PD's Office has a policy that requires that an employee submit medical documentation in support of absences, which have not been pre-scheduled or pre-approved, when those absences exceed 5 consecutive days. (Ex. 9, Simon aff. ¶ 8; Ex. 17, Sick Leave Policy.) Further, employees who are absent for more than five consecutive sick days may be required to provide a return to work authorization from their private physician and a County doctor. (*Id.*) (D's Facts, ¶ 18).

On January 21, 1997, Plaintiff was informed by Lauren Simon that she would not approve any request for time-off were same to be submitted by Plaintiff, and, further, that if Plaintiff intended to miss more time from work she would have to submit a request for "sick leave" to Public Defender Rita Fry. (Ex. 4, memo from Plaintiff to Lauren Simon, dated 1/29/97; paragraph V). (P's Stmt of Add'l Facts, ¶ 6.).

On January 23, 1997 by facsimile and on January 27, 1997 by mail, PD Fry received a letter from plaintiff requesting a sick leave "pursuant to policy" to recover from back surgery. (Ex. 18, Pltff. Letter of 1/23/97; Ex. 19, Pltff. Letter of 1/27/97.) Neither letter was accompanied by any medical documentation, nor did either letter indicate when plaintiff would be able to return to work. (*Id.*) (D's Facts, ¶ 19).

On January 27, 1997, PD Fry responded to plaintiff's letter requesting sick leave by explaining the requirements for processing such a request as follows:

> In order to process your request for a medical leave, I will need a report from your physician(s) stating the nature of your condition, diagnosis/prognosis and requisite period of convalescence. Further, the statement/report should include ALL TIME (retroactively) you have been off until that date your doctors feel it is safe for your return to work.

(Ex. 20, Fry Letter of 1/27/97.) (D's Facts, ¶ 20).

Instead of providing the medical documentation requested by PD Fry in support of her request for medical leave, plaintiff returned to work on January 29, 1997. (Ex. 16bb, Daily Time Record: 12/23/96- 1/31/97.) Plaintiff utilized a combination of sick, vacation, holiday and personal time to account for her absence from December 23, 1997 through January 28, 1997 in such a way that she never took five consecutive sick days. (Ex. 16a-aa, Daily Time Record: 12/23/96- 1/31/97.) (D's Facts, ¶ 21).

When plaintiff returned to work on January 29, 1997, she did not report during regular

operational hours in the PD's office; rather she reported at reported at (sic) 5:30 am and left at 1:45 pm. (Ex. 16bb, Daily Time Record:   12/23/96- 1/31/97.) (D's Facts, ¶ 22).

On January 29, 1997, plaintiff wrote a memorandum outlining her displeasure with Simon's efforts to monitor her work hours, availability, and absences.  (Exhibit 22, Pltff. memo of 1/29/97.)  Nowhere in the memo does plaintiff report that she is unable to return to work, nor does she indicate that she requires any accommodation to return to work; rather plaintiff insists that she should not be required to comply with Simon's stated policies regarding work hours and absence.  (*Id.*)  (D's Facts, ¶ 26).

Plaintiff repeated this conduct on January 30. (sic) 1997, reporting to work at 5:45 am and leaving at 12:45 pm. (Ex. 16cc, Daily Time Record: 12/23/96- 1/31/97.) (D's Facts, ¶ 23).

On January 31, 1997, plaintiff did not report to her office, rather she indicated on her time sheet that she went to Juvenile Court for meetings without indicating the hours that she worked. (Ex. 16dd, Daily Time Record: 12/23/96-1/31/97.) (D's Facts, ¶ 24).

Plaintiff's pattern of reporting at irregular hours continued on February 3rd, 4th, and 5th, 1997. (Group Ex. 21, Daily Time Record: 2/3/97-2/5/97.) (D's Facts, ¶ 25).

Simon generally made weekly contact with the Chiefs of her Division, and on February 3, 1997, she participated in a weekly meeting with plaintiff. (Ex. 23, Simon memo of 2/4/97.) During the meeting, plaintiff expressed her dissatisfaction with Simon's decision to assume direct oversight of the management budget, and indicated that she planned to question Simon's superior, Burnette, relevant to Simon's authority to do so.  (*Id.*) (D's Facts, ¶ 27).

On February 4, 1997, Simon advised plaintiff that she wished to meet with plaintiff to discuss her irregular office hours, and a meeting time was set for the afternoon of February 6, 1997. (Ex. 9, Simon aff. ¶ 9.) (D's Facts, ¶28).

On February 5, 1997, plaintiff met with Burnette to complain about the rules imposed upon her by Simon, and to express her concern that Simon was attempting to undermine her authority. (Ex. 25, Burnette aff. ¶ 1.)  Burnette admonished plaintiff to respect chain of command and comply with Simon's directives.  (*Id.*) (D's Facts, ¶ 29).

On February 6, 1997, for the first time since her extended absence, plaintiff reported to her office at 9:10 am.  (Ex. 24, Daily Time Record 2/6/97.)  However, approximately one hour before the scheduled meeting with Simon wherein her irregular work hours were to be discussed, plaintiff reported that she had been injured as the result of a fall from a chair. (Group Ex. 26a-c, Accident Reports of 2/6/97.)  Plaintiff then left the office on Injured On Duty status. (Ex. 24, *supra*). (D's Facts, ¶ 30).

On February 6, 1997, Plaintiff, while at work, fell over backwards in a chair in which she

was sitting. She fell in such a way as to strike here (sic) head on a metal bar immediately behind her, forcing her head sharply into her chest. An edge of the chair struck her back near the site of the surgery that had been performed in December. (Ex. 5, Industrial Commission of Illinois arbitrator's decision; page 3) (P's Stmt of Add'l Facts, ¶ 7).

That same afternoon Rhonda Berryhill ("Berryhill"), Personnel Coordinator sent a memo to plaintiff outlining the procedures for processing an injury on duty claim. (Ex. 27, Berryhill memo of 2/6/97.) (D's Facts, ¶ 31).

The February 6 accident rendered Plaintiff unable to work, as in its aftermath she experienced paresthesia in both of her legs, severe headaches, spasms in her lumbar and thoracic muscles, and pain in her dorsal, cervical, and lumbar spine. (Ex. 5, Industrial Commission of Illinois arbitrator's decision; page 5) (P's Stmt of Add'l Facts, ¶ 8).

Plaintiff remained absent from work commencing February 6, 1997 through July 21, 1997. (Ex. 28, Time summary for 1997.) (D's Facts, ¶ 32).

Immediately after the February accident Plaintiff commenced to perform from home her duties as Chief of Training, by the expedient of keeping in telephone contact with the Training Division staff. She was able to successfully complete the bulk of her duties in this fashion for several weeks. (Ex. 7, Plaintiff's answer to Defendant's interrogatory #1) (P's Stmt of Add'l Facts, ¶ 9).

On February 21, 1997, plaintiff's doctor authored a letter, which was received by the PD's Office on February 24th, explaining that plaintiff was experiencing neck, back and leg pain which he was treating by use of analgesics, muscle relaxants and a neck collar. (Ex. 29, Talbert letter of 2/21/97.) The doctor advised that plaintiff should remain off work for a least two more weeks, and possibly for another four to six weeks. (*Id.*) (D's Facts, ¶ 33).

On March 12, 1997 Plaintiff was examined by Dr. Glen Glista, a neurologist retained by the Cook County department of Risk Management. Near the end of his report Dr. Glista state (sic), "Hopefully, in a few weeks or so, [Plaintiff] will be able to resume at least some sort of part-time work." (Ex. 8, report by Dr. Glista) (P's Stmt of Add'l Facts, ¶ 10).

On March 13, 1997, Plaintiff sent a letter from her chiropractor to the Cook County Department of Risk Management, notifying the County that, due to neck and back pain and headaches, plaintiff was unable to return to work at that time. (Ex. 30, Costa-Trager Letter of 3/13/97). (D's Facts, ¶ 34).

In Late March, 1997, Plaintiff left a voice mail for Public Defender Rita Fry requesting permission to work from home on a part-time basis. The request was denied. (Ex. 9, letter from Rita Fry dated 3/31/97) (P's Stmt of Add'l Facts, ¶ 11).

On March 31, 1997, in response to a lengthy voice mail message left by plaintiff on her answering machine, PD Fry sent a letter to plaintiff indicating that that (sic) she was unable to allow plaintiff to perform any work on a part-time basis at home. (Ex. 31, Fry Letter of 3/31/97.) She explained that she could not allow plaintiff to work while she was on medical leave due to a job related injury until the County physician released plaintiff, and authorized her return to the workplace. (*Id.*) PD Fry advised that plaintiff take the time necessary to recover and gain the strength necessary to return to work on a full time basis. (*Id.*) (D's Facts, ¶ 35).

On April 2, 1997, Charles Tucker, from the Cook County Department of Risk Management, mailed to Plaintiff a letter requesting her to report to the Cook County Medical Unit on April 7, 1997 for processing to return to work. The letter stated as the basis for this directive that, based on the "Independent Medical Exam" of Plaintiff conducted by Dr. Glista, on March 12, 1997, Plaintiff had been "released to return to work in a sedentary position." (Ex. 10, letter from Charles Tucker to Plaintiff, dated 4/2/97) (P's Stmt of Add'l Facts, ¶ 12).

On April 4, 1997, Plaintiff obtained a letter from her chiropractor indicating that, although her condition had greatly improved, she still was not ready for full-time work because she still suffered from severe neck pain, daily headaches, back pain and stiffness, difficulty sleeping, and difficulty sitting, standing or walking. (Ex. 32, Costa-Trager Letter of 4/4/97.) The letter suggested "part-time hours are a possibility." (*Id.*) (D's Facts, ¶ 36).

On April 4 Plaintiff contacted Charles Tucker by telephone and advised him that Dr. Glista had in fact not indicated that Plaintiff could return to work on a full-time basis, and had, instead, indicated only that Plaintiff could possibly "resume at least some sort of part time work." (Ex. 11, letter from Plaintiff to Steven Hill, Rita Fry, Charles Tucker, and Irena McCoy; page 1; Ex. 8, report by Dr. Glista) (P's Stmt of Add'l Facts, ¶ 13).

During the course of the above-said conversation, Charles Tucker represented to Plaintiff that in addition to Dr. Glista, Dr. Michael R. Zindrick had also verbally released Plaintiff to return to work. (Ex. 11, letter from Plaintiff to Steven Hill, Rita Fry, Charles Tucker, and Irena McCoy; page 1) (P's Stmt of Add'l Facts, ¶ 14).

On April 7, 1997, plaintiff obtained approval from a County physician to return to work on a "½ time basis until re-evaluated." (Ex. 33, RTW of 4/7/97.) (D's Facts, ¶ 37).

However, the PD's Office budget does not include any part-time positions and is without a mechanism to compensate part-time staff; thus, plaintiff was advised that she could not return to work part-time. (Ex. 34, Fry dep, at p. 20, lines 7- 17; p. 24, line 17- p. 25, line 5; p.40, lines 7-23.) (D's Facts, ¶ 38).

After Defendant advised Plaintiff that she could not return to work on a part-time basis, as ordered by the County physician (See paragraph 37 and 38 of Defendant's statement of facts) Plaintiff received from Irena McCoy, Defendant's medical management nurse, a letter wherein

she was ordered to report for a subsequent "independent Medical Evaluation" scheduled for April 15, 1997, with Dr. Calvin R. Brown, Jr. (Ex. 11, letter from Plaintiff to Steven Hill, Rita Fry, Charles Tucker, and Irena McCoy; page 2) (P's Stmt of Add'l Facts, ¶ 16).

On April 7, 1997, plaintiff's primary care physician, Dr. Ellis Talbert, and her private orthopaedic specialist, Dr. Michael Zindrick, authored letters commenting on plaintiff's medical condition. (Ex. 35, Talbert Letter of 4/7/97; Zindrick Letter of 4/7/97.) Talbert indicated that he did not believe plaintiff should work more than three to four hours on any day, and that a return to full time employment would be detrimental to her recovery. (Ex. 35, *supra*.) Dr. Zindrick indicated that he was not willing to release plaintiff to return to work at the time of his letter. (Ex. 36, *supra*.) (D's Facts, ¶ 39).

On April 16, 1997, Plaintiff received from Charles Tucker a letter, dated April 14, informing her that if she did not keep her appointment with Dr. Brown her disability benefits would be suspended. (Ex. 11, letter from Plaintiff to Steven Hill, Rita Fry, Charles Tucker, and Irena McCoy; page 2). (P's Stmt of Add'l Facts, ¶ 18).

On April 23, 1997, Charles Tucker mailed to Plaintiff a letter wherein he notified her that the Cook County Employees' Injury Compensation Committee had suspended her disability benefits due to her failure to attend the appointment with Dr. Brown. (Ex. 13, letter from Charles Tucker dated 4/23/97) (P's Stmt of Add'l Facts, ¶ 20).

In late April, 1997 Plaintiff issued to Stephen Hill, Director of the Cook County Department of Risk Management, Public Defender Rita Fry, Charles Tucker, and Irena McCoy, a letter wherein she stated her objection to the suspension of her disability benefits, and explained the circumstances surrounding her failure to appear for the medical examination with Dr. Brown. (Ex. 13, letter from Charles Tucker dated 4/23/97; pages 1-3) In said letter, Plaintiff also indicated her willingness to attend another "independent medical examination", and requested merely that the doctor's office be located (sic) (P's Stmt of Add'l Facts, ¶ 21).

On June 9, 1997, plaintiff kept an appointment with the County's independent examiner, Dr. Michael Kornblatt of the Illinois Bone and Joint Institute. (Group Ex. 37a-b, Kornblatt Letters of 6/9/97 and 7/17/97.) Dr. Kornblatt's interview with plaintiff revealed that she had discontinued prescribed physical therapy sessions after three sessions because she felt pain in her neck. (Ex. 37a at p. 1, ¶ 2.) She then sought treatment with a chiropractor, but discontinued those treatments from mid-April through Mid-May. (*Id.* at p. 1, ¶ 2.) Dr. Kornblatt noted that plaintiff appeared very nervous during his exam to the extent that she was shaking. (*Id.* at p. 2, ¶ 3.) Dr. Kornblatt formed the opinion that plaintiff should try to resume her normal activities as soon as possible; that the only treatment indicated for her was an aggressive cervical and lumber rehabilitation program to consist of aerobic exercise along with stabilization exercise and education regarding proper body mechanics. (*Id*, at p. 3, ¶ 1.) Dr. Kornblatt believed that further chiropractic treatment was not indicated; and that plaintiff should resume her normal sedentary type of employment as soon as possible. (*Id.* at p. 3, ¶ 2.) He further believed that no surgery

was indicated, and that plaintiff could address her concern relevant to driving 40 miles to work by taking a break half way through the trip. (*Id.* at p. 3, ¶ 2.) (D's Facts, ¶ 40).

On July 2, 1997, Dr. Kim Trager, who a (sic) the time had been rendering Plaintiff chiropractic treatment three times per week, authored a letter wherein she stated, based on her treatment of Plaintiff and her review of various of Plaintiff's medical documents, that she was of the opinion that Plaintiff was unable to return to work on a full-time basis unless she was allowed to adjust her work her (sic) hours to accommodate her therapeutic needs, and was not required to commute to downtown Chicago five days per week. Specifically, Dr. Trager conditioned her release on Plaintiff's being allowed to work 2 or 3 days per week at home or at another location close to Plaintiff's residence. Dr. Trager conditioned the release also on Plaintiff's continuing to receive the treatment ordered by Dr. Ellis Talbert, her primary care provider. (Ex. 15, letter from Dr. Kim Trager, dated 7/2/97) (P's Stmt of Add'l Facts, ¶ 23).

On July 2, 1997, plaintiff authored a memorandum to PD Fry proposing that she be allowed to return to work "full time, but on a modified basis." (Ex. 38, Pltff. Memo 7/2/97.) Plaintiff sought permission to:

> perform my work at various locations including, but not limited to, my office at 200 West Adams (perhaps one day a week), our suburban courthouses (perhaps one day a week), a local law library (as needed to do research and obtain relevant materials) and at home (where I have access to a computer, can be reached by phone or pager and have nearby access to a fax machine). I will, as required by Public Defender and County policy, "be available during normal business hours" via pager, work "hours commensurate with my professional responsibility and carry my full workload."

(*Id.*) (D's Facts, ¶ 41).

On July 2, 1997, Plaintiff authored a memorandum to Public Defender Rita Fry and Charles Tucker regarding her return to work. Plaintiff indicated in the memorandum that she had herniated areas on both her neck and lower back, as well as nerve impingements that were causing weakness and pain in both her left arm and left leg. She indicated that she was on pain medication and medication for muscle spasms, and was receiving, in the way of therapy, electric muscle stimulation, acupuncture, and massage. She indicated, further, that on medical advice she intended to enter an "intensive rehab program" the following week, and, within two weeks, again on medical advice, intended to start receiving trigger-point cortisone injections in her neck and back. In light of the seriousness of her medical condition, and her need to attend rehabilitation sessions, Plaintiff proposed that she be allowed to return to work on a modified full-time basis. Specifically, Plaintiff requested that she be allowed to work from, in addition to Defendant's office in downtown, Chicago, a suburban courthouse located near her home, a local law library, and at home (where, she indicated, she had access to a computer, could be reached by phone and pager, and had nearby access to a fax machine). Plaintiff indicated as the basis for said request

-15-

that it would reduce the amount of driving she would have to while on pain and muscle medication, and would also allow time for therapy, whirlpool treatments, and rest. (Ex. 16, memo from Plaintiff to Rita Fry and Charles Tucker, dated 7/2/97) (P's Stmt of Add'l Facts, ¶ 24).

In said memorandum, Plaintiff also pointed that the Chief of Training was a position that fitted itself uniquely well to an off-site situation, since, at the time the memo was written, the position did not involve the supervisor (sic) of any staff, nor the direct supervision of any particular courtrooms. (Ex. 16, memo from Plaintiff to Rita Fry and Charles Tucker, dated 7/2/97) (P's Stmt of Add'l Facts, ¶ 25).

Public Defender Rita Fry responded to Plaintiff's July 2 memorandum in a letter dated July 15, 1997, wherein she denied outright Plaintiff's proposed accommodation. (Ex. 17, letter from Public Defender Rita Fry to Plaintiff, dated 7/15/97) (P's Stmt of Add'l Facts, ¶ 27).

On July 15, 1997, in response to plaintiff's request for full time work on a "modified basis," PD Fry wrote a letter wherein she denied the request and explained why plaintiff's proposal did not meet the Office's needs. (Ex. 39, Fry Letter of 7/15/97.) Fry explained that: the position of Chief of Training is "a fluid, interactive management position that requires a high degree of personal contact, brainstorming and planning with other members of the work force;" that the position of Chief includes direct supervisory responsibility for other staff; and that the Chief must be available, on a routine basis, to attend functions on behalf of the Public Defender with members of the judiciary, bar associations, criminal justice agencies, internal staff, and outside practitioners. (*Id.*) Fry noted that inquiries and correspondence often required immediate attention, and the need to respond to time sensitive material would be diminished where the Chief was not in the workplace. (*Id.*) Fry included a copy of the job description for the position of Chief of Training in support of her letter for plaintiff's review. (*Id.*) (D's Facts, ¶ 42).

On July 21, 1997, plaintiff received medical authorization to return to work without noted restrictions; she was to resume "full time, sedentary [activity] as before." (Ex. 40, RTW of 7/21/97.) (D's Facts, ¶ 43).

Immediately upon her return to work on July 21, 1997, plaintiff requested that Simon approve a request for time off, and supplemented that request in writing on July 22, 1997. (Ex. 41, Memo to file - 7/22/97; Ex. 42, Request Time Off - 7/22/97.) (D's Facts, ¶ 44).

On July 22, 1997, Plaintiff submitted to Lauren Simon a written request that she be allowed to take off each of the ensuing six Wednesdays. The requested time off would have consisted of two vacation days, two sick days, and two personal days--all of which Plaintiff had accrued. (Ex. 18, "request time off" for; Ex. 19, memorandum from Louise Greene to Lauren Simon, dated 8/5/97). (P's Stmt of Add'l Facts, ¶ 32).

On July 22, 1997, Simon authored a memo denying plaintiff's request, which sought the approval of one day off every week for six consecutive weeks, on the grounds that it effectively constituted a request to work on less than full time basis during that period. (Ex. 43, Simon memo of 7/22/97.) Simon advised plaintiff that the Training Division requires a full time chief; and that her request, without supporting documentation, did not override the operational requirements of the position. (*Id.*)   Simon suggested, however, that if plaintiff were to provide documentation in support of her request, her request would be reconsidered. (*Id.*) (D's Facts, ¶ 45).

Lauren Simon denied Plaintiff's request, in a memorandum authored on July 22, 1997, on the basis of an unspecified "operational necessity". (sic)   The memorandum stated that if Plaintiff were to submit documentation supporting her need for time off, her request would be reviewed again at the time of the document submission. (Ex. 20, Memorandum from Lauren Simon to Plaintiff, dated 7/22/97) (P's Stmt of Add'l Facts, ¶ 33).

On the afternoon of July 22, 1997, Plaintiff interrupted a meeting Simon was having with another employee to advise Simon that she intended to be off of work on the following day, July 23rd. (Ex. 44, Simon memo of 7/22/97.)   When Simon indicated that her request had been denied because it was unsupported by medical documents, plaintiff indicated that she had no intention of providing any such documentation to support her request. (*Id.*) Plaintiff indicated that she planned to take the day regardless of Simon's denial and would only furnish documentation after the fact. (*Id.*) (D's Facts, ¶ 46).

On July 23, 1997, Plaintiff issued to Lauren Simon a memorandum wherein she requested to know the specific nature and expected duration of the purported "operational necessity", (sic) as well as the type of documentation necessary to support her request for time off, to the end that she could prepare the documentation demanded by Ms. Simon in her above said memorandum of July 22, 1997. (Ex. 21, memorandum from Plaintiff to Lauren Simon, dated 7/23/97 (sic) (P's Stmt of Add'l Facts, ¶ 34).

On July 23, 1997, plaintiff reported to work and submitted a memorandum contesting Simon's "denial of benefits," and the requirement that she document the need for weekly time off. (Ex. 44, Pltff. Memo of 7/23/97.) (D's Facts, ¶ 47).

Plaintiff worked regular full time hours the first week after her return to work, from July 21st through July 25th. (Group Ex. 45a-e, Daily Time Record 7/21/97 - 7/25/97.) (D's Facts, ¶ 48).

In the early morning of July 29, 1997, Plaintiff left a telephone message for Lauren Simon and Edwin Burnette, wherein she notified them that she would that day be seeing her doctor on an emergency appointment basis, for treatment that she suspected would consist of novocaine shots in her neck and lower back, and thus would not be in to work. (Ex. 22, memo from Lauren Simon to "file", (sic) dated 7/29/97) (P's Stmt of Add'l Facts, ¶ 35.)

During the second week after her return to work, on July 29, 1997, plaintiff called the voice mails of both Simon and Burnette at 5:44am and left a lengthy message indicating that she would not report to work that day due to a doctor's appointment. (Ex. 46, Simon memo of 7/29/97.) During the course of her telephone message, plaintiff alleged that Simon's denial of her request for time off on July 22nd was retaliatory, and requested that a meeting be convened to review Simon's decision. (*Id.*) Plaintiff's message did not include an offer to provide documentation from her doctor in support of her request for time off. (*Id.*) (D's Facts, ¶ 49).

On neither July 23, 1997 nor July 30, 1997 (i.e., the first two days that Plaintiff had requested off), did anything of a critical nature take place in the Training Division. (Ex. 23, monthly report for July, 1997; page 5, paragraph B) (P's Stmt of Add'l Facts, ¶36).

In the early morning of August 4, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she was physically unable to work that day, and would likewise probably be unable to report to work the following day. (Ex. 24, memo from Lauren Simon the (sic) Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 37).

In a second early morning telephone message on August 4, 1997, Plaintiff informed Lauren Simon that on July 29, 1997 Dr. Ellis Talbert had advised Plaintiff that he was inclined to order Plaintiff off work, but that Plaintiff had convinced Dr. Talbert to instead issue an order merely restricting her work such that she could take days off as needed for pain. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 38).

In the early morning of August 5, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she was physically unable to report to work. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 39).

On August 9, 1997, Dr. Ellis Talbert authored a "work/school status report", (sic) wherein he stated that Plaintiff was medically unable to perform regular work duties, and would continue to be unable to do so at least until August 15, 1997, the date of her next appointment with Dr. Talbert. (Ex. 25, work/school status report dated 8/9/97) (P's Stmt of Add'l Facts, ¶ 40).

During the third week after her return, plaintiff called in sick on Monday and Tuesday, August 4th and 5th; and on August 6th, she worked an irregular schedule from 6:04 am to 2:15 pm. (Group Ex. 47a-c, Daily Time Records: 8/4/97- 8/6/97.) (D's Facts, ¶ 50).

Upon reporting to work on August 11, 1997, the Monday of her forth (sic) week back at work, plaintiff called the voice mails of Burnette and Simon at shortly after 6:00 a.m. to report that she had arrived at 6:04 am "to avoid the drive and the traffic," and that she planned to stay at work until "mid-afternoon, 2 or whatever." (Ex. 48, Simon memo of 8/11/97.) On August 12th and 13th, plaintiff called in sick; and on August 14th and 15th, she took unscheduled vacation days. (Ex. 49, Pay Period Summary 8/4-8/15/97.) (D's Facts, ¶ 51).

In the early morning of August 12, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she would be unable to return to work until she saw her doctor on August 15 because, inter alia, she could not adhere to the working regular business hours restriction. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 41).

On August 15, 1997, Dr. Ellis Talbert authored a "work/school status report", (sic) wherein he stated that Plaintiff was medically able to perform only restricted work. (Ex. 25, work/school status report dated 8/15/97) (P's Stmt of Add'l Facts, ¶ 42).

On August 18, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she had seen her doctor on August 15, and that he had advised her that she could work only two days per week, if she was able to tolerate the pain. Plaintiff further informed Lauren Simon that she intended to come to work on August 19 and 22, and that she would be going for further medical evaluation on August 25. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 44).

Plaintiff took the next week, Monday, August 18th through Friday August 22nd, off as unscheduled vacation time. (Group Ex. 50a-3, Daily time Records 8/15-8/22/97.) (D's Facts, ¶ 52).

On August 19, 1997, Simon sent plaintiff a letter notifying her pursuant to County policy that, because she had been absent from work for more than five consecutive work days due to illness, she would be required to submit a doctor's certificate as proof of illness before returning to work. (Ex. 51, Simon Letter of 8/15/97.) (D's Facts, ¶ 53).

On August 19, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she was physically unable to report to work that day, but would still try to come to work two days that week. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 45).

On August 20, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she was physically unable to report to work that day, but would try to come to work the next day. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 46).

On August 21, 1997, Plaintiff left a telephone message for Lauren Simon, wherein she informed her that she was physically unable to report to work that day, but would try to come to work the next day. Plaintiff also indicated in the telephone message how she would like to use her remaining accrued leave time. (Ex. 24, memo from Lauren Simon to Edwin Burnette, dated 8/19/97) (P's Stmt of Add'l Facts, ¶ 47).

On August 27, 1997, plaintiff responded by sending two memorandums and two work

status reports to PD Fry by facsimile. (Group Ex. 52 a-d, Plaintiff fax of 8/27/97.) (D's Facts, ¶ 54).

On August 27, 1997, Plaintiff authored a memorandum to Public Defender Rita Fry, wherein she requested a leave of absence. (Ex. 26, memo from Plaintiff to Public Defender Rita Fry dated 8/27/97) (P's Stmt of Add'l Facts, ¶ 48).

In plaintiff's first memorandum she engaged in a lengthy discussion of Fry's denial of her request to work on a modified basis; of her interaction with the Worker's Compensation staff; and of events that occurred when she returned to work. (Group Ex. 52b, Plaintiff fax of 8/27/97.) She concluded by indicating that she was renewing her request for sick leave. (*Id.*) (D's Facts, ¶ 55).

In plaintiff's second memorandum she verified that she had filed an Adjustment of Claim with the Illinois Industrial Commission relating to her disability claim; she asked that she be allowed to use all accrued time; and she asked to be placed on disability/sick leave status. (Group Ex. 52c, Plaintiff fax of 8/27/97.) (D's Facts, ¶ 56).

The first work status form indicated that plaintiff could not work until August 15, 1997. (Group Ex. 52d, Plaintiff fax of 8/27/97.) The second work status form indicated that plaintiff could only work two days per week if tolerated until August 29, 1997. (*Id.*) (D's Facts, ¶ 57).

On August 29, 1997, Dr (sic) Ellis Talbert authored a "work/school status report", (sic) wherein he stated that Plaintiff was medically unable to perform regular work duties until further notice. (Ex. 27, work/school status report dated 8/29/97) Plaintiff faxed a copy of said report to Public Defender Rita Fry on September 3, 1997. (Ex. 28, fax cover sheet dated 9/3/97) (P's Stmt of Add'l Facts, ¶ 49).

On September 3, 1997, plaintiff sent a work status report to PD Fry indicating that she could not work until further notice. (Ex. 53, Plaintiff fax of 9/3/97.) (D's Facts, ¶ 58).

On September 10, 1997, PD Fry wrote a letter advising plaintiff that, pursuant to County policy, in order for her request for a leave of absence to be processed; she must submit a physician's statement including the nature of the illness, his diagnosis and prognosis, and the approximate period of time required for healing. (Ex. 54, Fry Letter of 9/10/01 (sic).) (D's Facts,¶ 59).

On September 18, 1997, Doctor Talbert authored a letter wherein he stated that he was unaware when Plaintiff would be able to return to work. (Ex. 29, letter from Dr. Talbert dated 9/18/97) Plaintiff was of the belief that Doctor Talbert had duly forwarded the above-said letter to Defendant. (Ex. 30, memorandum from Paul Fields to Edwin Burnette dated 12/19/97; paragraph 5) (P's Stmt of Add'l Facts, ¶ 50).

On October 2, 1997, PD Fry sent a second letter to plaintiff advising her that she had not received the medical documentation requested in her letter of September 10th. (Ex. 55, Fry Letter of 10/2/97.) Further, Fry informed plaintiff that because her accrued time expired as of September 13th, she had been overpaid in the amount $2,144.28 and must repay that amount to the PD's Office. (Id.) Finally, plaintiff was cautioned that if she did not submit the appropriate forms for a leave with proper medical certification immediately, her employment would be in jeopardy. (Id.) (D's Facts, ¶ 60).

On October 5, 1997, plaintiff sent, by facsimile, a note from her primary care physician dated September 18, 1997 wherein he indicated that her prognosis was guarded, and that he was unsure when she would return to work. (Ex. 56, Talbert Note of 9/18/97.) (D's Facts, ¶ 61).

On October 6, 1997, Public Defender Rita Fry received from Plaintiff the September 18 letter authored by Doctor Talbert. The reason for the delay was that, unbeknownst to Plaintiff, the letter had been misfiled at Dr. Talbert's office, and thus had not been forwarded to Defendant on September 18. (Ex. 30, memorandum from Paul Fields to Edwin Burnette dated 12/19/97; paragraph 5) (P's Stmt of Add'l Facts, ¶ 51).

On October 23, 1997, PD Fry sent plaintiff a letter stating that, because she had failed to respond appropriately to Fry's letter of October 2, 1997, a date for hearing had been set for October 28, 1997 for plaintiff to show good cause why she should not be terminated. (Ex. 57, Fry Letter of 10/23/97.) (D's Facts, ¶ 62).

Plaintiff retained counsel to address the issue of her possible termination, and with the assistance of counsel, plaintiff completed the appropriate forms, submitted the appropriate medical documents, and agreed to repay any overpayment of salary. (Group Ex. 58a-b, Rothenberg letters of 11/17/97; Ex. 59, Zindick letter of 11/12/97.) (D's Facts, ¶ 63).

On November 17, 1997, Plaintiff, through counsel, tendered to Defendant an application (including a doctor's letter) for a leave of absence through January 1998. Defendant placed Plaintiff on unpaid leave status as of November 17, 1997. (Ex. 30, memorandum from Paul Fields to Edwin Burnette dated 12/19/97; paragraph 11) (P's Stmt of Add'l Facts, ¶ 52).

Based on the medical documentation provided by her orthopaedic doctor, Dr. Zindrick, plaintiff went on disability leave, remaining on said leave until May 1, 1998, when her primary care physician released her to return to work. (Ex. 60, Talbert Letter of 4/21/98. (D's Facts, ¶ 64).

A short time prior to plaintiff's submission of her return to work authorization, she was advised that her position a (sic) Chief of Training was being filled by another employee, and that she would be placed upon her return. (Ex. 60, Burnette Letter of 4/17/98.) (D's Facts, ¶ 65).

On May 14, 1998, plaintiff was placed in the position of Supervisor in the Appeals

Division. (Ex. 62, Reddy memo of 5/4/98.) (D's Facts, ¶ 66).

Plaintiff's new position carried the same official job title, grade and salary as her position as Chief of Training. (Group Ex. 63a-b, Report and Grant of Authority Forms.) (D's Facts, ¶ 67).

On May 15, 1998, Plaintiff was hospitalized due to back pain and dizziness. She was discharged on May 20, 1998. (ex. 32, letter from Dr. Talbert, dated 5/21/98) (P's Stmt of Add'l Facts, ¶ 54).

Plaintiff displayed a pattern of regular absenteeism in the first three months after her return to work on May 1st, resulting in the issuance of a warning from her supervisor, Jim Reddy ("Reddy"), on August 3, 1998. (Ex. 64, Reddy memo of 8/3/98; Ex. 65, Reddy memo of 7/27/98.) (D's Facts, ¶ 68).

On May 21, 1998, Dr. Ellis Talbert authored a letter wherein he stated that Plaintiff had been advised to limit her activities and get extensive bed rest. Dr. Talbert also stated that if her condition improved, Plaintiff would likely be able to return to work the following week. (Ex. 32, letter from Dr. Talbert, dated 5/21/98) (P's Stmt of Add'l Facts, ¶ 55).

On September 15, 1998, Dr. Ellis Talbert authored a letter wherein he stated that due to her recurrent pain Plaintiff would need to periodically take time off from work. (Ex. 33, letter from Dr. Talbert, dated 9/15/98) (P's Stmt of Add'l Facts, ¶ 56).

On September 16, 1998, plaintiff sent a memorandum to PD Fry indicating that she anticipated additional absence based on her medical condition despite the fact that she had no remaining sick time available for use. (Ex. 66, Pltff. Letter of 9/16/98.) Plaintiff asked that she be allowed to take "zero days", (sic) for illness only, when all other time off options were exhausted. (*Id.*) (D's Facts, ¶ 69).

On September 16, 1998, Plaintiff authored a letter to Public Defender Rita Fry, wherein she requested permission to take "zero pay sick days" for illness only, when all of her other "time-off" options had been exhausted. (ex. 34, letter from Plaintiff to Public Defender Rita Fry, dated 9/16/98) (P's Stmt of Add'l Facts, ¶ 57).

On October 7, 1998, PD Fry sent a memorandum to plaintiff explaining that she had already been absent 38 days since her return to work in May, and 29 of those days were "zero" days which were taken without proper authorization. (Ex. 67, Fry Letter of 10/7/98.) Fry advised plaintiff that "zero" days could only be used in extraordinary situations, and that her medical needs were more appropriately addressed by a request for a leave of absence. (*Id.*) Plaintiff was instructed to apply for any necessary leave by October 15, 1998, with the appropriate supporting documents, and was further advised that a failure to take appropriate steps to address her need for continuing absences could result in disciplinary action. (*Id.*) (D's Facts,

¶ 70).

On October 14, 1998, plaintiff responded to Fry's directive regarding the filing of an application for disability leave by stating that she did not need a leave of absence at that time. (Ex. 68, Pltff. Letter of 10/14/98.) Plaintiff further stated that she intended to request "zero" days as a "reasonable accommodation" as needed, but hoped that such requests would be minimal. (*Id.*) (D's Facts, ¶ 71).

Plaintiff proceeded to take October 19, 22, 23, 26 and 27, 1998 as "zero" days without obtaining authorization from PD Fry. (Ex. 69, Time Summary - 1998; Ex. 70, Reddy memo of 8/28/98.) (D's Facts, ¶ 72)

When plaintiff returned to work on October 28, 1998, Reddy met with her to discuss the ongoing problem with her use of unauthorized sick days. (Ex. 70, Reddy memo of 8/28/98.) Plaintiff admitted that: she was aware of the need for Fry's approval of "zero" days; that she had not obtained such approval; that her failure to obtain Fry's approval could subject her to discipline; and that she intended to take additional "zero" days in the coming week. (*Id.*) (D's Facts, ¶ 73).

On November 5, 1998, plaintiff's primary care physician wrote a note indicating that plaintiff could not return to work without absenteeism, and thus, should be returned to disability status. (Ex. 71, Talbert Letter of 11/5/01.) (D's Facts, ¶ 74).

On November 6, 1998, plaintiff authored a request to return to disability status, and remains on disability status currently. (Ex. 72, Pltff. Letter of 11/6/98; Ex. 73, Pltff. Response to Interrogatory 1. (D's Facts, ¶ 75).

On or about October 29, 1997, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Ex. 74, EEOC Charge of Discrimination.) In her charge plaintiff alleges that she suffered discriminatory treatment as the result of a disability, but does not make any allegations of retaliation. (*Id.*) In fact, plaintiff was afforded the opportunity in completing her charge to indicate, by checking a box, that the cause of discrimination was retaliation. (*Id.*) Plaintiff checked only the box that indicated disability as the cause of discrimination, and left retaliation blank. (*Id.*) (D's Facts, ¶ 76).

On September 13, 1999, the EEOC issued a Dismissal and Notice of Rights, advising plaintiff that based upon the EEOC investigation, the EEOC was unable to conclude the information obtained established violation of the statutes; and advising plaintiff that if she wished to proceed on her claim she must file suit within 90 days of receipt of the notice. (Ex. 75 Dismissal and Notice of Right To Sue.) (D's Facts, ¶ 77).

Plaintiff filed her complaint in the instant case on December 9, 1999, alleging that she was protected under Title VII in that: she suffered discrimination based on a disability as

prohibited by the Americans with Disabilities Act; and that she suffered retaliation after engaging in a protected expression. (Ex. 76, Complaint. ) (D's Facts, ¶ 78).

On September 18, 2001, at the Hampton Inn Hotel in Chicago, plaintiff was deposed. (Ex. 4, Pltff dep. at p. 4 lines 10-13.) Plaintiff requested that the deposition be taken in the afternoon at a hotel because due to her physical condition and the numerous medications she takes: she finds it difficult to function before noontime; she has difficulty traveling; and she needs to sit in heavily cushioned chairs which allow her to recline. (*Id. )* at p. 10, line 19-p. 36, line 22, and p. 104, line 17 - 105, line 20.) (D's Facts, ¶ 79).

At her deposition plaintiff admitted that, at all times since February of 1996, it has been difficult for her to get through the day without being primarily in a reclining position, and that she could not remain in a sitting position for more than two and half or three hours at a time. (*Id.* at p. 37, line 23- p. 38, line 14.) (D's Facts, ¶ 80).

Plaintiff also admitted that since the development of her back condition in February 1996, she would not be able to function in the position of supervisor in the appeals division, and to the extent that she could supervise staff in appeals, she could only do so if they were "really top-notch and just needed advice and minimal supervision"; she could not be physically present every day to supervise them. (*Id.* at p. 87, line 13- p. 88, line 11.) Plaintiff suggested that she could only return to work with the PD's Office in the role of Chief of Training because she viewed that position as the only one that "would easily accommodate" her needs. (*Id.* at p. 87, lines 6-12.) (D's Facts, ¶ 81).

When asked whether she could do any job in the PD's office that required her to report to work five days a week during regular business hours, plaintiff testified as follows:

Q       Can you leave your home and report to work five days a week to do a regular business day?

A.      I don't think so.

Q.      No. Okay. So the only way that you can be employed by the Public Defender's Office is if they allow you to work at home at least a significant portion of your 40-hour workweek; is that correct?

A.      Right.

\* \* \* \*

Q       I'm asking you if there's anything that you're aware of that would make it possible for you to report to your job site five days a week for the course of a regular business day?

-24-

A.    I suppose if– I don't know if I could stay all day.  I was going to say I suppose if I had a chauffer (sic) or somebody pick me up and I suppose if there was some kind of special furniture that could be ordered  – it would be embarrassing – but I suppose with those two things.

Q     A chauffer (sic) to drive you to and from your office –

A.    Yeah.

Q     – and a refurbished office that allowed you to recline during the course of the day?

A.    Yeah.

(*Id.* at p. 89, lines 9-27, and p. 91, lines 3 - 18.)    (D's Facts, ¶ 82).

Plaintiff concedes that the Position of Chief of training does require that: she report to work for the purpose of meetings with the legal community and PD staff, that she travel distances requiring more than two hours in a car, and that she meet with people in an office setting. (*Id.* at p. 107, line 20- 108, line 22.)    (D's Facts, ¶ 83).

Plaintiff maintains that there are only two "accommodations" which would allow her to return to work: flexible part-time hours, or modified full time flexible scheduling that would give her the discretion to work. (*Id.* at p. 155, line 5 - p. 159, line 20.)  Plaintiff admits, however, that currently; "[She has] as much of a problem with the mental condition as with the physical condition that would make it very difficult for [her] to go back to work."[2] (*Id.*. at p. 157, lines 5-12.)    (D's Facts, ¶ 84).

Plaintiff summarized her request for accommodation as follows during her deposition:

A     No, I want to work.  I happen to love what I did.  What I want is very simple.  I want to be able to get there when I can.  I need to be able to be trusted with my own schedule, which I should have been and have been all along.  I've never screwed them out a minute's worth of work.  It's always been well in excess of 40 hours.

I want things lifted, like, people who were told not to speak to me, that they were not to discuss anything with me.  You know, I think Lauren Simon owes me an apology.  You know, I think that she was really off base a lots of times.  So that's why I say psychological.  The physical accommodations, yes, I think are still there and still workable and still appropriate.

---

[2]  This reference appears to relate to the "current" time, the time of the deposition, September 2001.  No mention is made of any "mental condition" in any other context.

*(Id.* at p. 159, line 14 - p. 160, line 4.)    (D's Facts, ¶ 85).

## IV. Summary Judgment Standard

In *Amadio v. Ford Motor Co.*, 238 F.3d 919 (7th Cir. 2001), the court said at 924:

> [W]e bear in mind that summary judgment is only proper when the 'pleadings,
> depositions, answers to interrogatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue as to any material fact and
> that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P.
> 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548,
> 91 L.Ed. 2d 265 (1986).

## V. Prima Facie Case Under ADA

The plaintiff establishes a prima facie case under the ADA when she has shown by
admissible evidence that:

(1).    she suffers from a disability as defined by the Americans with Disabilities Act
(ADA), 42 U.S.C. § § 12101-12213;

(2).    she is qualified, with or without reasonable accommodation, to perform the
essential functions of her position; and

(3).    was discriminated against by her employer because of her disability.

*See* 42 U.S.C. § 1210 *et seq.*

The defendant for purposes of this motion only does not dispute that there is a genuine
issue of material fact regarding whether the plaintiff was disabled. However, the defendant
argues that the plaintiff has not established that she is a qualified individual capable of
performing the essential functions of her position or that the defendant discriminated against her
by refusing to grant a reasonable accommodation.

> Where there is no genuine issue of material fact, the sole question is
> whether the moving party is entitled to judgment as a matter of law. If the
> nonmoving party fails to establish the existence of an element essential to his
> case, one on which he would bear the burden of proof at trial, summary judgment
> must be granted to the moving party. *Richards v. Combined Ins. Co. of America,*
> 55 F.3d 247, 251 (7th Cir. 1995). It is not our function to scour the record in
> search of evidence to defeat a motion for summary judgment; we rely upon the

nonmoving party to identify with reasonable particularity the evidence upon which he relies. *Id.* The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment. *Wigod v. Chicago Mercantile Exch.* 981 F. 2d 1510, 1518-19 (7th Cir. 1992); *See also* Fed. R. Civ. P. 56(e).

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).


## VI.  Qualified Individual With A Disability

A "qualified individual with a disability" is defined, in relevant part, as: "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(9). Whether someone meets the definition of a "qualified individual with a disability" involves a two-step determination. 29 C.F.R. app. § 1630.2(m). First, we consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* If he does, then we must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The determination as to whether an individual is a "qualified individual with a disability" must be made as of the time of the employment decision. *Id.* The plaintiff bears the burden of proof on this issue; he must be able to show that he is a "qualified individual with a disability" in order to successfully prosecute an ADA claim. See *DeLuca v. Winer Indus., Inc.* 53 F.3d 793, 797 (7th Cir. 1995).

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996) at 563.

Cook County Public Defenders' Office does not dispute the first step, that is, that Lynne H. Miller had the requisite experience, skills and education to perform as Chief of the Training Division or as Supervisor in the Appeals Division. Nor does Miller dispute that she could not have performed the essential functions of her job without reasonable accommodation. The question is whether Miller has put forth sufficient evidence that she could perform the essential functions of her job with reasonable accommodation. *Id. Bombard v. Fort Wayne Newspapers, Inc., supra.*

It is without dispute that the plaintiff requested accommodation on more than one occasion–for part-time in April 1997, for full-time on a modified basis in July 1997, and for use of "zero" days in September 1998.

## A. Part-Time

In early April 1997 there was medical approval from the County physician that she might return to work on a half-time basis, but the defendant informed the plaintiff that she could not return to work on a part-time basis, because the office budget did not include any part-time positions and was without a mechanism to compensate part-time staff.

On July 22, 1997, the plaintiff requested that she be allowed to take each of the ensuing six Wednesdays, consisting of two vacation days, two sick days, and two personal days. By memo, the plaintiff's direct supervisor informed the plaintiff that the request effectively constituted a request to work on less than a full-time basis and said that the plaintiff's position required a full time Chief. The request was rejected on the ground of an unspecified "operational necessity." (D's Facts, ¶ 45; P's Stmt of Add'l Facts, ¶ 33).

Given the lack of evidence that the essential functions of the job of either Chief of the Training Division or Supervisor in the Appeals Division could be performed in a half-time basis, I cannot consider it to be sufficient to enable the plaintiff to be a qualified individual with a disability.

## B. Full-Time, But On A Modified Basis

On July 2, 1997, the plaintiff authored a memorandum to Public Defender Fry that the plaintiff be allowed to return to work "full time, but on a modified basis." (P's Stmt of Add'l Facts, ¶ 23.) More specifically, the proposal was that she work at various locations, including her downtown office perhaps one day a week, the suburban courthouses perhaps one day a week, a local law library, and at home, where she had access to a computer and could be reached by phone or pager and a fax machine. She said she would be available "during normal business hours" by a pager, and work sufficiently to carry her full workload. (D's Facts, ¶ 41). This, she indicated, would reduce the amount of driving she would have to do while on pain and muscle medication and would allow time for therapy, whirl treatments, and rest. (P's Stmt of Add'l Facts, ¶ 24). She noted that the Chief of Training was a position that "fitted itself uniquely well to an off-site situation, since, at the time, the position did not involve supervising any staff nor the direct supervision of any particular courtrooms." (P's Stmt of Add'l Facts, ¶ 25). This proposal was denied outright by Public Defender Rita Fry by a letter in which she explained that the position of Chief of Training is "a fluid, interactive management position that requires a high degree of personal contact, brainstorming and planning with other members of the workforce;" that the position includes direct supervisory responsibility for other staff; and that the Chief must be available, on a routine basis, to attend functions on behalf of the public defender with members of the judiciary, bar associations, criminal justice agencies, internal staff, and outside practitioners. Fry said that inquiries and correspondence often required immediate attention, and the need to respond to time sensitive material would be diminished if the Chief were not in the workplace.

On September 18, 2001, the plaintiff's deposition was taken. She admitted in that deposition that, at all times since February of 1996, it has been difficult for her to get through the day without being primarily in a reclining position, and that she cannot remain in a sitting position for more than two a half or three hours at a time. (D's Facts, ¶ 80).

The plaintiff also admitted at her deposition that since February 1996 she would not be able to function in the position of Supervisor in the Appeals Division and to the extent that she could supervise staff in appeals, she could do so only if they were "only really top notch and just needed advice and minimal supervision, as she could not be physically present everyday to supervise them" She suggested that she could only return to work in the Public Defender's Office in the role of Chief of Training, because she viewed that position as the only one that "would easily accommodate" her needs. (D's Facts, ¶ 81).[3]

Could she have performed the essential functions of the job of Chief of Training in and around that time by working in the downtown office part of the time and at suburban offices, a local law library and her home at other times? That is impossible to say from the record before me. Public Defender Fry responded to the request by denying it and saying that there had to be a "high degree of personal contact, brainstorming and planning with other members of the workforce . . ., direct supervisory responsibility for other staff; . . . and the availab[ility], on a routine basis to attend functions on behalf of the Public Defender with members of the judiciary, bar association, criminal justice agencies, internal staff, and outside practitioners." The principal problem I see that is that the proposal was neither directly addressed by the defendant nor was any effort made by the defendant to work out a modification of the proposal nor was the plaintiff given any opportunity to test it.

Questions reasonably to be asked about the defendant's response include: What is a "high degree" in this position? How much time does it take? Where can it reasonably be performed? What other staff? How often is "routine"? Where can it reasonably be done? What experience of the plaintiff or the defendant shows what kinds and amounts of

---

[3]     In the deposition the plaintiff also said that she did not think she could report to work "five days a week to do a regular business day . . ." She said that the only way she could work at the Public Defender's Office would be if they allowed her to work at home "at least a significant portion" of her 40-hour workweek. She supposed that she could report to her job site five days a week for the course of a regular business day only if she had a chauffeur or somebody pick her up to drive her to her office and a refurbished office that would allow her to recline during the course of the day. (D's Facts, ¶ 82). Thus, the plaintiff insists that there are only two accommodations that would allow her to return to work: flexible part-time hours or modified full-time flexible scheduling that would give her discretion to work. (D's Facts, ¶ 83). It must be observed that the statements set out above in this paragraph appear to refer to the time period of September 18, 2001, not necessarily the 1997-8 time frame when the adverse actions occurred about which the plaintiff claims. The statements are of no value in assessing the plaintiff's ability to do the work in 1997 and 1998.

accommodation could be made that would accomplish the double goals of doing the job and avoiding "undue hardship"? These questions have not been addressed in specific or realistic terms by sensible discussions between the parties, primarily because–I am forced to say from the evidence before me–of the defendant's responding to suggestions with nothing more than a blunt refusal devoid of any counterproposal or invitation to discuss variations of any proposal.

### C. Use of "Zero" Days

On September 16, 1998, the plaintiff asked that she be allowed to take "zero days," for illness only, when all other time-off options were exhausted. (D's Facts, ¶ 69). Public Defender Fry sent a memorandum to the plaintiff on October 7, explaining that the plaintiff already had been absent 38 days since she returned to work in May, and 29 of those days were "zero" days that had been taken without proper authorization. Fry said that "zero" days could be used only in extraordinary situations and that her medical needs were more appropriately addressed by a request for leave for absence and advised the plaintiff that a failure to take appropriate steps to address her need for continuing absences could result in disciplinary action and instructed the plaintiff to apply for any necessary leave by October 15, 1998, with appropriate supporting documents. (D's Fact, ¶ 70).

On October 14, 1998, the plaintiff said that she did not need a leave of absence at that time, that she intended to request "zero" days as a "reasonable accommodation" as needed, but hoped that such requests would be minimal. (D's Facts, ¶ 71).

On November 6, 1998, the plaintiff authored a request to return to disability status, and she remains on that status currently. (D's Facts, ¶ 75).

What the problem was from the defendant's viewpoint of the plaintiff's proposal to take "zero" days for illness only, when all other time-off options were exhausted, is not at all clear. Evidently, "zero" days are simply days that entitle the plaintiff to no pay. Why that would work undue hardship to the defendant's business operation is not addressed. The plaintiff was told that such days could be used "only in extraordinary situations." Why that present situation was not extraordinary is not explained. The plaintiff was also told that "her medical needs were more appropriately addressed by a request for leave of absence," and why that was so was not explained. The defendant did not assert that the plaintiff could not accomplish her obligations to her job by taking "zero" days and did not claim that the taking of "zero" days would in some manner be a hardship to the defendant. Whether in fact the plaintiff would have been able to do a good job with the use of that proposal of "zero" days is not developed by either side to permit me to make a finding as to whether she could or could not, but it appears to me that the evidence permits the subject to lie quietly for resolution at a jury trial.

In short, there was little, if any, attempt by the defendant to work at making an accommodation to the satisfaction of both parties.

"An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer. We recognized this in *Beck* [*v. University of Wisconsin Bd, of Regents*], 75 F.3d 1130, 1134-35 (7th Cir. 1996), where we held that both parties bear responsibility for determining what accommodation is necessary. *Beck*, 75 F.3d at 1135.

. . . '[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.' 29 C.F.R. *pt.* 1630, app.; *Beck*, 75 F.3d at 1135.

*Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).

The upshot of the evidence, construed most favorably to the plaintiff, the non-moving party, as I must, *Id.*, is that the plaintiff, who was an experienced employee in the job of Chief of Training, says she could do the job with reasonable accommodation, which involves full-time work, but with a flexible schedule and working part of the time outside the office, or using "zero" days, while the defendant thinks she cannot. That makes a reasonable jury question of the matter.

## VII. Discrimination

Title 42, U.S.C. § 12112(b)(5)(A)-(B) defines "discrimination" under the ADA as:

(5)(A) Not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]; or

(B) Denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make a reasonable accommodation to the physical or mental impairments of the employee or applicant.

It, then, is the duty of the employer to "demonstrate" that the accommodation would impose an undue hardship on the operation of the business, or to show that the denial is not based on the need to make a reasonable accommodation to the physical or mental impairments of the employee. This the defendant has failed to do. Whether the accommodations requested by the plaintiff would impose an "undue hardship" on the Public Defender's Office, and what hardship or how much hardship would be encountered are too poorly defined in the evidence to permit me to say one way or the other.

IT IS ORDERED that the Defendant's Motion for Summary Judgment, filing 51, is denied.

Dated February 14, 2002.

BY THE COURT

Warren K. Urbom
United States Senior District Judge